UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:15-cr-00154-VC(LB) |
| Plaintiff, | ) | |
| v. | ) | |
| PAVEL SEMENOVICH FLIDER, | ) | |
| Defendant. | ) | |

San Francisco, California
Wednesday, December 16, 2015

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL
ELECTRONIC SOUND RECORDING - FTR 9:52-10:10

APPEARANCES:

For Plaintiff:
       U.S. Attorney's Office
       Organized Crime Strike Force
       450 Golden Gate Avenue, 11th Floor
       San Francisco, CA 94102
  BY:    **PHILIP JOSEPH KEARNEY, JR.. AUSA**

For Defendant:
       Attorney & Counselor at Law
       Private Mail Box 394
       5095 Napilihau Street, Suite 109B
       Lahaina, HI 96761
  BY:    **MARCUS DANIEL MERCHASIN, ESQ.**

Also Present:  Brad Wilson, Pretrial Services

*Transcribed by Kelly Polvi, Contract Transcriber, utilizing
court reporting and transcription hardware and software.*

| | |
|---|---|
| 1 | **WEDNESDAY, DECEMBER 16, 2015**               **9:52 A.M.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | (The defendant was personally present and assisted by a |
| 5 | Russian-language interpreter.) |
| 6 | **THE CLERK:**  Calling criminal action CR 15-0154, USA |
| 7 | versus Pavel Semenovich Flider. |
| 8 | Counsel, please state your appearances for the record. |
| 9 | **MR. KEARNEY:**  Your Honor, I'll go first, I guess.  Phil |
| 10 | Kearney for the United States.  Good morning. |
| 11 | **THE COURT:**  Good morning, Mr. Kearney. |
| 12 | **MR. MERCHASIN:**  Good morning.  Marcus Merchasin for |
| 13 | Mr. Flider. |
| 14 | **THE COURT:**  All right.  Good morning to you both. |
| 15 | **MR. WILSON:**  Good morning, Your Honor.  Brad Wilson, |
| 16 | pretrial. |
| 17 | **THE CLERK:**  And we have a Russian interpreter. |
| 18 | **THE COURT:**  Okay. |
| 19 | **THE INTERPRETER:**  Yes.  And could Your Honor make sure |
| 20 | that the interpreter hears everybody? |
| 21 | **THE COURT:**  Okay. |
| 22 | Speak up. |
| 23 | All right.  Have you already been sworn in the case? |
| 24 | **THE INTERPRETER:**  Yes, I have, Your Honor. |
| 25 | **THE COURT:**  All right.  Good morning. |

1          THE INTERPRETER:  Good morning.

2          THE DEFENDANT:  (Through the interpreter.)  Good morning.

3          THE COURT:  Okay.  So this case is on calendar because

4     you want the electronic monitoring lifted.  Pretrial services

5     doesn't object.  The government does object, but you think that

6     you don't have an objection to the relaxation of the curfew,

7     your concern is essentially something that means that you can

8     keep track of whether Mr. Flider is in the Northern District of

9     California.

10          MR. KEARNEY:  That is well stated, Your Honor.  And

11    just -- there's objecting and there's "objecting."

12          The government's position is that we adamantly object.

13          And I honestly -- my first reaction to this request is

14    the -- for lack of a better word, the chutzpah involved.

15          As this Court well remembers, the government was very,

16    very disinclined to -- very opposed to the release at all,

17    given the extent of the damage done to national security and

18    the extent of the -- frankly, the monetary aspect.

19          We've established, now, about $69 million that the shell

20    corporation here in San Francisco made through these illegal

21    exports.

22          Since the filing of this case, we have found that 1651

23    USML parts were exported by -- these were not charged, by the

24    way, we didn't charge a conspiracy to violate the Arms Export

25    Control Act.  But we have proven, in our minds, we have found

1    in his drives, evidence that over 1600 USML parts went to

2    Russia, we strongly believe, to the Russian military industrial

3    complex.

4         The -- we understand that the defendant's wife and

5    daughter are leaving for Moscow tomorrow on a planned trip.

6         We have had -- and we are in -- not a closed courtroom,

7    Your Honor, but we are in a courtroom where there is no one

8    besides the parties in attendance.

9         We've had two proffer sessions since we were last before

10   this Court, one in August and one in September.  The government

11   would characterize those as very, very tepid, I've

12   (indiscernible) to counsel on several occasions, half-hearted

13   sessions where they were more of almost cross-examination

14   sessions.

15        As the Court knows from the Court's long experience,

16   these proffer sessions are typically, "I want to cooperate;

17   here's what I know."

18        This was exactly the opposite of that.  And so much so

19   that the agents -- we've talked about further proffers and the

20   agents are, frankly, not willing to waste their time listening.

21        So we've devolved now to the next step in the process is

22   a planned attorney proffer where, in writing, we will receive

23   kind of an overall statement of what the client would be

24   willing to talk about if we did another proffer session.

25        We are back in front of Judge Chhabria February the 18th.

1      **THE COURT:**  February 18th?  Okay.

2      **MR. KEARNEY:**  The -- the government strongly -- strongly

3  believes that the monitoring should stay on at least until

4  then.

5      And frankly, Your Honor, the -- while I wouldn't say plea

6  negotiations have completely broken down -- I know this is not

7  part of the Court's purview -- we anticipate, on the 18th,

8  asking for a trial date, unless there is a sea change in the

9  status of this case.

10      And, as the Court knows, the impetus of the plea tends to

11  become greater -- and the courts have recognized this -- as

12  trial dates approach.  It's a factor that this Court can take

13  into account when assessing the appropriate bail conditions and

14  bond conditions.

15      And honestly, the motivation for this -- and Counsel is

16  very forthcoming in this regard -- is his own client's desire

17  to feel free.  And I just think that is a completely baseless

18  reason to be taken off monitoring at this stage when --

19  especially with the background in this case, how much contact

20  this defendant has overseas.  Maybe he will stay; maybe he

21  won't.  We just don't know.

22      There's been a lot of -- the government does know there's

23  been a lot of harm done to national security, based on what we

24  know in this case, and there's no reason to upset the apple

25  cart at this stage.  Things are working fine.

1       We talked to pretrial services.  The burden on them to

2   maintain monitoring as -- and Mr. Wilson, please correct me if

3   I'm wrong -- but the burden on them to maintain it is minimal.

4       So I see no reason to change the status of this -- of

5   this case right now.

6       **THE COURT:**  Okay.  But -- now I'll come to you in a

7   second, but -- I want to ask at least a logistical question of

8   pretrial.  But you don't mind relaxing the curfew; right?

9       **MR. KEARNEY:**  We don't.

10      **THE COURT:**  Okay.

11      **MR. KEARNEY:**  I think we've already made that known to

12  pretrial services.

13      **THE COURT:**  Okay.  Let me just ask a couple of logistical

14  questions.

15      How does monitoring work?  I mean, is it -- you enforce

16  it by a curfew, and so --

17      And so we've had two kinds of monitoring, one is the one

18  where you got to be home at a certain time and the reason --

19  and that you enforce it by, essentially, the telephone calls;

20  right?  To make sure somebody's actually at home and there's

21  the sort of monitoring station.

22      And then there's the other kind, which is GPS, which is

23  basically the one where you're making sure someone hasn't left

24  the district.

25      And so just what -- can you just tell me how that is

1    working here and what the possibilities are?

2         MR. WILSON:  Sure.  He's on the location monitoring.

3         THE COURT:  Okay.

4         MR. WILSON:  But we get radio frequency, which means --

5         THE COURT:  Does he have to wear an anklet?

6         MR. WILSON:  -- he has a bracelet on his ankle.

7         THE COURT:  I wish you guys would go to the Fitbit model,

8    you know.  There really is some technology now that Oregon's

9    using which it looks more like a Fitbit bracelet.

10        Anyway, so -- sorry.  It's less intrusive and it looks

11   more normal.

12        Okay, but so that's what he's on.

13        MR. WILSON:  He -- when he's home, the monitor recognizes

14   him being home, and when he's not, he's not.  So as long as

15   he's home during those hours --

16        THE COURT:  I see.

17        MR. WILSON:  -- we don't get any alerts.

18        THE COURT:  I see.  But what about -- can you tell where

19   he is when he's out and about?

20        MR. WILSON:  No, Your Honor.

21        THE COURT:  But you have that separate kind of

22   monitoring, too; GPS monitoring.

23        And what does that look like, technologically?

24        MR. WILSON:  It's similar.  The unit's a little bit

25   larger and it has its own battery.

1       **THE COURT:**  Okay.

2       **MR. WILSON:**  But that would be an escalation in

3    supervision.

4       **THE COURT:**  All right.  Okay.  Fine.  That's fine.

5       So -- so, you know, look, here's the thing -- and you can

6    tell me what you think.  I'm -- I'm sympathetic.  A lot of

7    people signed on the bond form.

8       I personally, although I appreciate Mr. Kearney's

9    proffer -- and, again, maybe I'm so jaded that I don't think of

10   85 percent of 108 months -- which I think was the guidelines

11   range we talked about -- translating into about 7 -- you know,

12   that's about 85 months, 86 months, a year in a halfway house,

13   probably 6 to 11, 11 months on average in this district.

14      People then -- you know, it's a 7-and-a-half year

15   sentence.  It doesn't seem to me that if someone's an American

16   citizen with all the benefits that attach to living here that

17   in the end someone's going to take off.

18      But Mr. Kearney's also right that when you do get trial

19   dates -- my little joke, and it's not a very good one, I know

20   it's not a very good one, but it's like we don't have to worry

21   about (indiscernible) now; it will be later.  But that's just a

22   joke.

23      I tend to think that in the great wash of sentences

24   people get it's not a lot -- I know it's a lot to someone who

25   hasn't been to jail before, so I'm mindful of that context --

1    still, Mr. Kearney describes the case with some national

2    security implications.

3    I wonder why -- and is intimating that at least through

4    February why can't a more relaxed curfew -- I mean, we have

5    people who work very unusual hours because they're in

6    construction; right? And they have curfews that, by any sort

7    of estimation, are reasonable for any of us, unless you really

8    want to be up till 4:00 in the morning, but I think that

9    Mr. Flider has a daughter -- right? -- who's at school.

10   **MR. MERCHASIN:** Right.

11   **THE COURT:** And so we set early hours for him.

12   Why isn't a more relaxed curfew a fine first step, at

13   least till February?

14   And I appreciate the -- what I'm going to call the

15   "hassle factor" of having to wear the bracelet on the ankle,

16   and I realize that's no fun.

17   **MR. MERCHASIN:** Well, it's no fun and it's -- you can't

18   take a shower and you can't do a lot of other things and it's

19   really an inconvenience.

20   I would initially point out that we strenuously object to

21   characterizations of what has been discussed --

22   **THE COURT:** I appreciate that.

23   **MR. MERCHASIN:** -- and whatever.

24   When a person buys a hundred thousand dollar house and

25   sells it for a hundred and 2,000, it's not a hundred and $2,000

amount of money made. And anything Mr. Flider made he declared

income taxes on it, paid income taxes on it, it's over a

five-year period, paid salaries, paid rent, paid to acquire

equipment and that type of thing.

As far as military equipment, from everything that I've

shown to my honorable opponent on this matter, they're not

military-grade pieces of hardware or equipment.

We have some enthusiastic agents. If you say the cup is

half full, they'll say it's overflowing. We don't have a good

meeting of the minds in agreement on what certain things mean.

But that hasn't stopped us from proceeding diligently to make

proffers, to point stuff out, and to do as much benefit, both

for the United States and for our client, as we can.

He's an American citizen. He would like to help his

government. When he asked the agents in 2013 whether he should

not be exporting because they were concerned about some stuff

they told him, you know, "Go ahead. Keep going." That type of

thing. He did.

**THE COURT:** Well, so, but I'm -- well, I appreciate the

context. Really what I want to look at is this issue of -- the

family's going to Moscow. How long is the trip?

**MR. MERCHASIN:** Not too long. The wife -- the reason she

has to go is she's a dentist.

**THE COURT:** What about the daughter? There's the minor

daughter. Is she going?

1          MR. MERCHASIN:  She's going with her mother.

2          THE COURT:  And how old is she, then?  Eleven; is that

3     right?

4          MR. MERCHASIN:  Pardon?

5          THE COURT:  Is the daughter eleven?  Twelve?

6          MR. MERCHASIN:  Twelve.

7          THE COURT:  And when does school start again?

8          THE DEFENDANT:  (In English.)  We got extension from the

9     school.

10         MR. MERCHASIN:  When does it start?

11         THE DEFENDANT:  (Through interpreter.)  We agreed with

12    the principal of the school for the extension for two months.

13         THE COURT:  Oh, so she's going to be off for two months.

14         MR. MERCHASIN:  And they're already getting the homework

15    assignments --

16         THE INTERPRETER:  I'm sorry, sir.  I haven't finished.

17         THE DEFENDANT:  (Through interpreter.)  About a month and

18    a half, sir.

19         THE COURT:  Okay.

20         MR. MERCHASIN:  They've got, at least as just stated, a

21    month and a half worth of homework assignments, which they

22    wouldn't be getting if they weren't planning on coming back and

23    going back to school.

24         Mrs. Flider is a dentist --

25         THE COURT:  I think it's "Flyder."  Right?

1    MR. MERCHASIN:  "Flyder."

2    THE COURT:  Is that right?  It's "Flyder"?

3    THE DEFENDANT:  "Flyder," yes; yes.

4    THE COURT:  Sorry.

5    MR. MERCHASIN:  Mrs. Flider is a dentist.  She is not

6    licensed in California yet.  She's making a point of learning

7    the English language so she can pass the exams.  She's in the

8    process of or has sold her practice in St. Petersburg.  The

9    people who have taken over are very good about collecting

10   income but not particularly excellent in paying it.

11       So at the point in time where she's meeting all expenses

12   of a St. Petersburg dental practice and not getting the income

13   from it, she's got to go over there and take legal action and

14   do what you have to do to preserve your assets and that type of

15   thing because she sure is not making any money here until she

16   can become licensed as a dentist and she's qualified to do

17   that.

18       THE COURT:  Could -- I just want to ask one question of

19   pretrial.

20       Is the (indiscernible) of that if someone were to break

21   the anklet would you know it?

22       MR. WILSON:  Yes.

23       THE COURT:  And it sends out an alert.

24       MR. WILSON:  Yes.

25       THE COURT:  And even if they did it from, you know, the

1    middle of the street --

2        MR. WILSON:  Any time (indiscernible) we would be

3    alerted.

4        THE COURT:  Okay.  All right.  Okay, sorry.

5        All right.  Okay.  So sorry.  So I think that's fine.  I

6    understand.

7        So here's what I'm inclined to do -- today, at least,

8    although I'll reconsider -- it seems to me that over time maybe

9    there's something we can arrange to have, you know, check-ins

10   with pretrial services that might be the equivalent of

11   electronic monitoring.

12       What I can do is by relaxation of the curfew I can give

13   Mr. Flider a lot more flexibility in how he spends his time.

14       The only reason that a curfew is -- the only reason to

15   have a curfew is because that's the only way that we can set up

16   alerts.  So there has to be "a" curfew.

17       It's sort of -- the GPS -- I will tell you that the GPS

18   alternative, which doesn't require a curfew -- and you can talk

19   to pretrial services -- is considered more onerous because your

20   whereabouts are tracked all the time and it's bulkier, is

21   essentially the concern.

22       My inclination is to set a curfew at a time you suggest.

23   I really don't care.  It could be 1:00 A.M. to 6:00 A.M.  That

24   sort of thing.  It could be that abbreviated.

25       The only reason to set any time period at all is for the

1    alert factor.  I realize it doesn't help with the shower

2    factor.  That's a pain in the neck.

3         So I don't care what the time is so much.  I think it

4    suits Mr. -- Mr. Kearney doesn't care if Mr. Flider goes out to

5    a restaurant and comes home at 1:30 A.M.; he wants to be able

6    to just verify that if he breaks the anklet we get an alert and

7    if we -- so 2:00 A.M. is fine too.

8         And as early in the morning a Mr. Flider thinks, I think

9    as interim measure until the family gets back, whatever modest

10   level of concern I attach to that -- which is modest.

11        I hear what you're telling me; you're saying the family

12   has every incentive to remain here.  That said, I think we can

13   up Mr. Flider's flexibility substantially with how he spends

14   his time to approach any, you know, normal way of engaging with

15   an active life in San Francisco.

16        If you can figure out a technological alternative to GPS

17   monitoring that's less intrusive, I'm happy to consider it.  I

18   don't think pretrial services' technology is there yet, but --

19        But that would be the interim measure I would propose.

20        So why don't you ask your client what -- and, again, I'll

21   be extremely flexible with the curfew.  The only thing --

22   reason to set a curfew is I literally have to set something

23   because of the alert factor of the technology.

24        MR. MERCHASIN:  Thank you.  Let me take a moment and talk

25   with Mr. Flider.

1       THE COURT:  Okay.

2       MR. WILSON:  Your Honor, just to clarify.  You can take a

3  shower with the unit on.  It is water resistant.

4       THE COURT:  Is it water resistant?

5       MR. WILSON:  They can take a shower.  They just can't go

6  in the bathtub, submerge the unit, so.

7       THE COURT:  Okay.  Fitbit bracelet, honestly.  I said it

8  to Alan --

9       MR. WILSON:  The issue with having it on their wrist is

10  they tend to focus on it and tamper with it because it's right

11  there.

12       THE COURT:  Exactly.

13       MR. WILSON:  It's a constant thing.  So that would be the

14  issue.

15       THE COURT:  That's part of it, yeah.  But it's -- it

16  would look normal to the whole world and no one would care

17  because everyone wears the bracelet -- the bracelets.

18       All right.

19       MR. MERCHASIN:  Recognizing we won't get a hundred

20  percent of what we'd like, how about 2:00 A.M. to 5:00 A.M.?

21       THE COURT:  That's fine.  I mean, unless if he breaks --

22       Look.  It means that he can go out to a restaurant and

23  stay out until it closes.  If he wants to get up in the morning

24  and go for a run at 5:00 A.M. on a Tuesday morning, he can do

25  it.  If he breaks the anklet you'll know about it because it's

1    an alert.

2         And pretrial services has just got to have a curfew.

3         I mean, that's the latest he probably would be out on any

4    given night, including New Year's Eve, and the earliest he

5    probably would be getting up on any given morning.

6         You've got your tracking and you've got your alerts and

7    you've got your daily recognition that he's home.

8         Can you live with it?

9         **MR. KEARNEY:**  Well, Your Honor, we'd be more comfortable

10   with, say, a noon -- midnight imposition to 6:00, or something

11   like that.  But we appreciate the Court maintaining electronic

12   monitoring.

13        **THE COURT:**  Okay.

14        **MR. KEARNEY:**  So we'll submit the matter.

15        **THE COURT:**  2:00 A.M. to 5:00 A.M.  Or whatever you say.

16   You got to be in at 2:00 A.M., out no earlier than 5:00 A.M.

17   If you get out earlier than that, then you're -- in the

18   morning, you're a better person than any of us for getting

19   exercise.

20        Okay.  All right.  So that will be the order for now.

21        **MR. KEARNEY:**  Thank you, Your Honor.

22        **THE COURT:**  Okay.  All right.

23        **MR. MERCHASIN:**  Thank you.

24        (Proceedings adjourned at 10:10 A.M.)

25

## CERTIFICATE OF CONTRACT TRANSCRIBER

I, Kelly Polvi, CSR, RMR, FCRR, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated January 5, 2015.

_____
Kelly Polvi, CSR #6389, RMR, FCRR
Contract Transcriber

Kelly Polvi, CSR, RMR, FCRR
P.O. Box 1427
Alameda, CA 94501
(503) 779-7406; kpolvi@comcast.net